J-S23043-15
J-S23044-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO L.A.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.A.S., MOTHER | No. 3403 EDA 2014 |

Appeal from the Decree Entered November 12, 2014,
in the Court of Common Pleas of Lehigh County,
Orphans' Court, at No(s): A2013-0051

| | |
|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO R.P.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.A.S., MOTHER | No. 3406 EDA 2014 |

Appeal from the Decree Entered November 12, 2014,
in the Court of Common Pleas of Lehigh County,
Orphans' Court, at No(s): A2013-0052

BEFORE:  DONOHUE, SHOGAN, and STRASSBURGER*, JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED JUNE 03, 2015**

L.A.S. (Mother) appeals from the decrees entered November 12, 2014, in the Court of Common Pleas of Lehigh County, which terminated involuntarily Mother's parental rights to her minor daughter, L.A.M., born in

---

* Retired Senior Judge assigned to the Superior Court.

October of 2006, and to her minor son, R.P.M., born in November of 2007 (collectively, the Children).[1]  We affirm.

In September of 2011, Mother agreed to place the Children in the care the Lehigh County Office of Children and Youth Services (CYS), due to her homelessness and Father's incarceration.  The Children were adjudicated dependent on October 13, 2011.  Initially, the Children were placed in the care of Father's parents.  However, they were moved to a pre-adoptive foster home in approximately May of 2013.  On May 6, 2013, CYS filed petitions to terminate involuntarily Mother's parental rights to the Children.  A termination hearing was held on January 27, 2014.  On November 12, 2014, the orphans' court entered its decrees terminating Mother's rights.[2]  Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal.

Mother now raises the following issue for our review.

> Was the [orphans' c]ourt justified in granting the Petition to Terminate Parental Rights against the mother of the two

---

[1] The decrees of the orphans' court also terminated the parental rights of the Children's father, M.P.M. (Father).  Father is not a party to the instant appeal.

[2] On January 28, 2014, the orphans' court ordered that the termination proceedings be transcribed.  On March 11, 2014, the court entered an order indicating that the transcript had been received, and requiring CYS to submit a legal brief, along with proposed findings of fact and conclusions of law, by April 7, 2014.  The court also required Mother, Father, and the Children's guardian *ad litem* to submit legal briefs, as well as proposed findings of fact and conclusions of law, by May 7, 2014, and scheduled argument for May 16, 2014.  It is not clear from the record why the court did not enter its termination decrees until nearly six months after argument.

children when the [c]ourt determined that [CYS] proved by clear and convincing evidence that one or more of the statutory reasons permitting termination existed and that the needs and welfare of the [C]hildren required the termination of the [M]other's parental rights?

Mother's brief at 8.[3]

We consider Mother's claim mindful of the following.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our courts apply a two-part analysis in reviewing a decree terminating parental rights. This Court has explained,

> [i]nitially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the

---

[3] Mother has filed separate briefs for each decree from which she appeals. However, Mother's briefs are nearly identical.

needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8) and (b). We need only agree with the orphans' court as to one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under subsections 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition

> filed pursuant to subsection (a)(1), (6) or (8), the court shall not
> consider any efforts by the parent to remedy the conditions
> described therein which are first initiated subsequent to the
> giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A
> § 2511(a)(2), the following three elements must be met: (1)
> repeated and continued incapacity, abuse, neglect or refusal; (2)
> such incapacity, abuse, neglect or refusal has caused the child to
> be without essential parental care, control or subsistence
> necessary for his physical or mental well-being; and (3) the
> causes of the incapacity, abuse, neglect or refusal cannot or will
> not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the orphans' court found that Mother's lack of involvement with the Children has left them without essential parental care and control, and that Mother has failed to demonstrate that she will be able to parent the Children in the future. Orphans' Court Opinion, 11/12/2014, at 25. The court emphasized that Mother has not displayed a "serious intent to recultivate a parent-child relationship or to demonstrate a willingness and capacity to undertake the parental role." *Id.* Mother argues that the court

- 5 -

"failed to see" her "effort and desire … to try and reestablish a safe and nurturing environment" for the Children, as well as Mother's efforts to maintain "the semblance of a relationship" with the Children. Mother's Brief at 14. Mother contends that she cares successfully for an older child, who is not involved in the instant appeal, and that she has obtained drug treatment and avoided illegal drug use. *Id.* at 16.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by terminating involuntarily Mother's parental rights to Child. During the termination hearing, CYS caseworker Heather Reed testified that she was assigned to this matter in July of 2012. N.T., 1/27/2014, at 15. Ms. Reed explained that Mother was ordered, *inter alia*, to complete a drug and alcohol evaluation, comply with recommendations, and submit three urine screens per week. *Id.* at 25. According to Ms. Reed, Mother made "some progress" between review hearings in March of 2012 and June of 2012, in that she completed a short-term inpatient drug and alcohol treatment program and was discharged to a halfway house. *Id.* at 28-29, 47. However, Mother was discharged unsuccessfully from the halfway house "as she was not following rules," and then "went to a sober house for a brief amount of time." *Id.* at 29.

Ms. Reed further testified that, around this time, Mother informed her that she "didn't feel she was safe" living in the area any longer, because she "owed money to a bunch of people," and that Mother "felt that she couldn't

remain sober and safe here and wanted to relocate to North Carolina where both of her parents reside." *Id.* at 29. Ms. Reed later specified that Mother "owed drug dealers money." *Id.* at 48. Ms. Reed informed Mother that relocating to North Carolina would make regaining custody of the Children more difficult. *Id.* at 59. Nonetheless, Mother relocated to North Carolina "shortly after" a review hearing in June of 2012. *Id.* at 31. Mother reported to CYS in August of 2012 that she was receiving drug, alcohol, and mental treatment in North Carolina. *Id.* at 32-33. Despite Mother's purported drug treatment, she tested positive for cocaine and ethyl glucuronide on August 27, 2012. *Id.* at 32. According to Ms. Reed, Mother provided a number of negative urine screens in October, November, and December of 2012.[4] *Id.* at 86.

With respect to visitation, Ms. Reed testified that Mother has visited with the Children for a total of 12 hours since they were placed in care. *Id.* at 41. Mother did not engage in regular visitation with the Children while she was living in North Carolina, though she did have some unsupervised phone contact with the Children during the time they were living with Father's parents. *Id.* at 35-36, 53. Mother requested that CYS perform an interstate compact study to see if the Children could come and live with her in North Carolina. *Id.* at 33-34, 49. However, Ms. Reed explained that two

---

[4] CYS also presented the testimony of Mr. Adam Carbone, who explained that he is the general manger at Substance Abuse Screenings Services, or "S.A.S.S.I." N.T., 1/27/2014, at 8. According to Mr. Carbone, Mother tested positive for oxycodone and amphetamines on January 24, 2014. *Id.*

studies were performed with respect to two of Mother's different residences in North Carolina, and that both studies were denied due to lack of progress. *Id.* at 33-34. Mother appeared for a permanency review on February 14, 2013, and visited with the Children for an hour the following day. *Id.* at 37. Ms. Reed noted that this was the last time Mother visited with the Children. *Id.* at 43, 85. Mother asked that she be allowed to call R.P.M. on his birthday, but this request was denied because Mother had not seen or talked to the Children in many months. *Id.* at 43.

Mother testified that she resides in North Carolina with her mother and her 14-year-old son. *Id.* at 142, 156. Mother explained that she moved to North Carolina because she had "family support" there, and because "it would be a little easier away from people, places and things." *Id.* at 146. Mother stated that she no longer is receiving drug and alcohol treatment in North Carolina, as she "completed the groups that [she] was going to," but that she does attend Narcotics Anonymous meetings three times per week. *Id.* at 147. Mother claimed that she last used drugs prior to attending inpatient treatment. *Id.* at 145, 152. Mother also indicated that she takes prescription medications, including Adderall and oxycodone. *Id.* at 150-51.

Mother further testified that she has been charged in North Carolina with "[p]ossession of stolen property … felony break-ins[.]" *Id.* at 157. Mother indicated that these charges stemmed from an incident or incidents involving "[m]ore than one car battery." *Id.* at 160-61. Mother claimed

that her attorney "already told me that everything would be dropped." *Id.* at 158. Mother also stated that she has been offered a plea bargain that would not result in incarceration. *Id.* at 161.

Concerning her contact with the Children, Mother testified that she sent the Children "Halloween cards" and "holiday cards" after moving to North Carolina, and that she spoke with them on the phone "[a]t least four or five times a week" while they resided with Father's parents. *Id.* at 147-48. Mother indicated that she attempted to call L.A.M., rather than R.P.M., a week before her birthday, but that CYS did not permit the phone contact. *Id.* at 154. Mother explained that she did not send a birthday card to L.A.M. because "there was money in it, and [she] didn't want to send it and they didn't get their money." *Id.* at 154. Mother did not send a Christmas card "because there would be money in the card too." *Id.*

Accordingly, the record supports the finding of the orphans' court that Mother has left the Children without parental care, control, or subsistence, and Mother cannot, or will not, remedy the situation. While Mother made some progress by completing inpatient drug treatment, the record reveals that Mother's drug and alcohol issues remain unresolved, as she tested positive for cocaine and ethyl glucuronide in August of 2012. Mother also tested positive for oxycodone and amphetamines on January 24, 2014. While Mother suggests in her brief that this positive drug test resulted from prescription medications, she failed to provide any documentation during the

termination hearing to support this claim. Moreover, Mother moved to North Carolina despite being told that a move would make it more difficult to regain custody of the Children. After the Children were placed in a pre-adoptive foster home, Mother made little, if any, effort to maintain contact with them. While Mother claimed during the termination hearing that she lives with her 14-year-old son, there was no testimony with respect to the appropriateness of care or support that she provides for him. Even assuming that Mother does take appropriate care of her son, this does not excuse her failure to work toward achieving reunification with the Children in the instant matter.

We next consider whether the orphans' court abused its discretion by terminating Mother's parental rights under Section 2511(b).

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

- 10 -

Here, the orphans' court concluded that terminating Mother's parental rights would be in the Children's best interests. Orphans' Court Opinion, 11/12/2014, at 28. The court emphasized that the Children have had minimal contact with Mother since they entered foster care, and that they are thriving in their current foster family. *Id.* Mother concedes that she has "not done her best" to maintain a relationship with the Children, but notes that the Children reacted positively to her during their time together. Mother's brief at 17. Mother insists that she should have been allowed to "rekindle" her relationship with the Children. *Id.*

We again conclude that the orphans' court did not abuse its discretion. Ms. Reed testified that she observed "a little bit" of Mother's visit with the Children in 2013, and that the Children hugged Mother and "[d]efinitely were happy to see her." *Id.* at 42-43. However, Ms. Reed explained that she visits with the Children on a monthly basis at their foster home, and that the Children never ask about Mother or request to live with her again. *Id.* at 43. Ms. Reed opined that the Children are doing "really well" in foster care, and that terminating Mother's parental rights would be in the best interests of the Children. *Id.* at 40-41. Mother reported that she wants to care for the Children, and that she has a "very strong bond" with them. *Id.* at 152-53.

Thus, the testimony presented during Mother's termination hearing supports the orphans' court's conclusion that it is in the Children's best

interest to terminate Mother's parental rights. While the Children enjoyed seeing Mother in February of 2013, this was Mother's final visit with the Children, and it is unlikely that the Children have maintained a parent-child bond worthy of preservation. To the extent the Children still are bonded with Mother, that bond clearly is outweighed in the instant matter by Mother's failure to remedy her drug abuse issues, by her complete lack of commitment toward reunification, and by the Children's need for permanence and stability. *See In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa. Super. 2015) (concluding that the appellant mother's bond with C.D.R was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by C.D.R.'s need for permanence and stability). No relief is due.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by terminating involuntarily Mother's parental rights to the Children, we affirm the decrees of the orphans' court.

Decrees affirmed.

Judge Donohue did not participate in the consideration or decision of the memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/3/2015